# OPINION *

### UNITED STATES, as the United States Element, Allied Kommandatura, Berlin

v.

### Hans Detlef Alexander TIEDE and Ingrid Ruske, Defendants.

### Cr. Case Nos. 78–001, 78–001A.

### United States Court for Berlin.

March 14, 1979.

APPEARANCES:

For the Prosecution:

Andre M. Surena, Legal Advisor, U. S. Mission, Berlin, United States Attorney for Berlin;

Roger M. Adelman, Assistant U. S. Attorney for the District of Columbia, Special Prosecutor for Berlin;

Gisela Wolf, Oberstaatsanwältin, Berlin, and

Marianne Fischer, Regierungsdirektorin, Office of the Senator for Justice, Berlin, Assistant Prosecuting Officers.

For the Defendant Tiede:

Judah Best, Esquire, of the District of Columbia Bar;

Kenneth L. Adams, Esquire, of the District of Columbia Bar; and

Dietrich Herrmann, Esquire, of the Berlin Bar.

For the Defendant Ruske:

Bernard Hellring, Esquire, of the New Jersey Bar;

Richard D. Shapiro, Esquire, of the New Jersey Bar, and

Dr. Ulrich E. Biel, of the Berlin Bar.

Clerk of the Court:

Bruno A. Ristau, Director, Office of Foreign Litigation, U. S. Department of Justice, Washington, D. C.

* We are pleased to make available to the American Bench and Bar this important opinion authored by United States District Judge Herbert J. Stern, sitting as a judge of the United States Court for Berlin. In reaching his conclusion that the United States Constitution extended the right to a jury trial to the defendants in this criminal proceeding, Judge Stern provides a review of authorities of great importance in international constitutional and criminal law.

STERN, Judge [**]

This is a criminal proceeding arising out of the alleged diversion of a Polish aircraft by the defendants from its scheduled landing in East Berlin to a forced landing in West Berlin. United States authorities exercised jurisdiction over this matter and convened this Court. Court-appointed defense counsel have now moved for a trial by jury. The Prosecution objects, contending that these proceedings are not governed by the United States Constitution, but by the requirements of foreign policy and that the Secretary of State, as interpreter of that policy, has determined that these defendants do not have the right to a jury trial.

The special nature of this Court and the unusual position taken by the United States Attorney for Berlin require an extensive account and analysis of the history of the occupation of Berlin, the jurisdictional basis of this Court, and the limitations, if any, on the Secretary of State and the American authorities who govern the 1.2 million people who reside in the American sector of Berlin. The Court holds that the United States Constitution applies to these proceedings and that defendants charged with criminal offenses before the United States Court for Berlin have constitutional rights, including the right to a trial by jury.

## I. FACTUAL BACKGROUND

On August 30, 1978, a Polish civilian aircraft on a scheduled flight from Gdansk, Poland, to Schoenefeld Airport in East Berlin, was diverted and forced to land at Tempelhof Airport in the United States sector of West Berlin.[1] Following the landing, defendants Hans Detlef Alexander Tiede and Ingrid Ruske, together with Mrs. Ruske's twelve-year-old daughter, were detained by United States military authorities at a U. S. Air Force installation located at Tempelhof. On November 1, 1978, the United States Mission in Berlin advised the German authorities in West Berlin that it would exercise jurisdiction over the investigation and prosecution of any crimes committed in connection with the diversion of the Polish airliner.[2] Mrs. Ruske was released from detention on November 3; her daughter had been released several weeks earlier.

The United States authorities, acting under the authority of Law No. 46, a law promulgated in 1955 by the former United States High Commis-

---

[**] Herbert J. Stern, United States Judge for the District of New Jersey, sitting as United States Judge for Berlin by appointment of the United States Ambassador to the Federal Republic of Germany.

1. Berlin has been occupied since 1945 by the four Allied Powers. As more fully discussed below, West Berlin is administered jointly by the United Kingdom, France, and the United States, each power being responsible for its respective sector.

2. Jurisdiction was exercised pursuant to Articles 7 and 10 of Allied Kommandatura Berlin Law No. 7 of March 17, 1950, which provides in pertinent part:

### ARTICLE 7

1. The appropriate Sector Commandant may . . . withdraw from a German Court, any proceeding directly affecting any of the persons or matters within the purview of paragraph 2 of the Statement of Principles governing the relationship between the Allied Kommandatura and Greater Berlin.

### ARTICLE 10

The appropriate Sector Commandant may take such measures as he may deem necessary to provide for the determination of cases which under this Law will not be within the jurisdiction of the German Courts.

sioner for Germany, then convened this Court.[3]  On November 30, 1978, the Honorable Dudley B. Bonsal[4] was sworn in as United States Judge for Berlin.  Judge Bonsal limited his function to the promulgation of rules of criminal procedure which govern the bringing of charges, pretrial proceedings, and trials in this Court.  Judge Bonsal was succeeded by the Honorable Leo M. Goodman,[5] who took the oath of office as United States Judge for Berlin on December 6, 1978.

On that day a complaint, supported by an affidavit executed by a U. S. Air. Force investigating officer, was filed against the defendant Tiede.[6] Based on the complaint, Judge Goodman issued a warrant for the arrest of Tiede.  The warrant was executed the same day and Tiede was brought before Judge Goodman who advised him of his rights under the United States Constitution and explained to him the nature of the criminal complaint filed against him.  In view of Tiede's indigency, Judge Goodman assigned a member of the Berlin criminal bar as counsel for Tiede.  Following Tiede's presentment, and upon the defendant's request, Judge Goodman scheduled a preliminary hearing and arraignment for mid-January.

Also on December 6, a complaint with supporting affidavit was filed against the defendant Ruske.  On the basis of that affidavit Judge Goodman caused a summons to be issued, commanding Mrs. Ruske to appear before the Court in mid-January for presentation and arraignment.  German defense counsel was appointed by Judge Goodman for the defendant Ruske in late December.

On January 11, 1979, the author of this opinion became United States Judge for Berlin.  The defendants were arraigned the next day.  Prior to arraignment, this Court appointed American counsel for both defendants because the proceedings would be conducted under American procedural law, although German substantive law would apply.  Defendants filed timely motions demanding a trial by jury.

## II.  HISTORICAL BACKGROUND

### A.  Overview of the Allied Occupation of Germany since World War II.

#### 1.  The Occupation of Germany.

In 1944, some eight months before final victory in the Second World War, the United States, the United Kingdom and the Soviet Union began

---

3.  Law No. 46 is reproduced in full in the appendix to this opinion.

4.  Senior United States District Judge, and former Chief Judge, of the United States District Court for the Southern District of New York.

5.  Former Judge of the United States Court of the Allied High Commission for Germany, and presently the United States Member on the Supreme Restitution Court, Germany.

6.  The complaint read in pertinent part: That on or about 30 August, 1978, Hans Detlef Alexander Tiede did, by means of force, threats and a weapon, that is a pistol, take a hostage, and divert Polish LOT Flight No. 165 while from its scheduled route of Gdansk, Poland to Schoenefeld Airport and force it to land at Tempelhof Central Airport in Berlin.

preparing for the occupation of a defeated Germany. They formed the European Advisory Commission and agreed on the division of pre-War German territory into three zones of occupation and on the principle that Greater Berlin would be administered jointly by the Allies.[7] A second agreement created the Allied administration structure for governing occupied Germany.[8] Subsequently, the Provisional Government of the French Republic was invited to participate in the occupation of Germany, and the British and United States zones of occupation were redivided to create a fourth, the French zone of occupation.[9]

On June 5, 1945, the Allies declared the total defeat of Germany and assumed "supreme authority" over the country, "including all the powers possessed by the German Government, the High Command and any state, municipal or local government or authority." The Allied declaration expressly denied any intent to "effect the annexation of Germany."[10] A Control Council, composed of the Commanders-in-Chief of the occupying forces of each of the Four Powers, headed the Allied administration. Its responsibilities were to coordinate the administration of the four zones, to legislate on matters affecting Germany as a whole, to supervise the German central administration, and to direct jointly the government of Berlin "through appropriate organs."[11] Decisions of the Control Council were required to be unanimous.

The Allies' objectives in occupied Germany went far beyond an ordinary belligerent occupation of enemy territory. First, the Allies had to provide for the complete civil, economic and judicial administration of the country because the German Government had totally collapsed.[12] Second, the Allies expressly sought the denazification and the democratization of German political life. They hoped to accomplish this by initially decentralizing the German Government, thus eliminating the influence of the National Socialist Party. Third, the Allies contemplated a reunification of Germany as one of the final objectives of the occupation.[13]

Beginning in 1948, the Soviet Union increasingly obstructed decision making in the Allied governing bodies and imposed restrictions on access

**7.** Protocol on Zones of Occupation in Germany and Administration of "Greater Berlin", Approved by the European Advisory Commission, Sept. 12, 1944, 5 U.S.T. 2078, T.I.A.S. No. 3071, 227 U.N.T.S. 279.

**8.** Agreement on Control Machinery in Germany, Adopted by the European Advisory Commission, No. 14, 1944, 5 U.S.T. 2062, T.I.A.S. No. 3070, 236 U.N.T.S. 359.

**9.** Protocol of Proceedings of Crimea (Yalta) Conference, Feb. 11, 1945, reprinted in DOCUMENTS ON GERMANY, 1944–1971, Committee on Foreign Relations, United States Senate, 92d Cong., 1st Sess. 8 (1971) [hereinafter "DOCUMENTS ON GERMANY"].

**10.** Declaration Regarding the Defeat of Germany and the Assumption of Supreme Authority by the Allied Powers, Signed at Berlin, June 5, 1945, DOCUMENTS ON GERMANY, *supra* note 9 at 12, 13.

**11.** Agreement on Control Machinery in Germany, Art. 3(b), *supra* note 8.

**12.** *See* Declaration Regarding the Defeat of Germany, *supra* note 10.

**13.** *See* Protocol of the Proceedings of the Berlin (Potsdam) Conference, August 1, 1945; DOCUMENTS ON GERMANY, *supra* note 9 at 32, 34.

between the Western zones of occupation and Berlin.[14]  On July 1, 1948, the Soviet Commander-in-Chief withdrew from the Allied Control Council, thus frustrating that body's ability to legislate for Germany as a whole.[15]  Thereafter, the Three Western Allies began to administer the three Western zones without Soviet participation.

In 1949, the Three Western Powers took steps toward establishing and eventually transferring authority to a new German Government.  They enacted an "Occupation Statute" to govern the relationships between the Western powers and the newly-created "Federal Republic of Germany." [16] Through a series of agreements which entered into force in 1949, the Three Powers merged the administration of the three Western zones in Germany, authorized the adoption of a "Basic Law" (a constitution) establishing a democratic federal state for the Western zones, terminated military government zones, and substituted a civilian Allied administration.[17]  The new center of this occupation authority was the "Allied High Commission," which was composed of three civilian High Commissioners.[18] Within the United States Government, responsibility for occupation functions then shifted from the Defense Department to the Department of State.[19]

On October 19, 1951, the state of war between the United States and Germany was formally terminated.[20]  In 1952 a series of agreements among the Three Powers and the Federal Republic of Germany, known collectively as the "Bonn Conventions," were signed.[21]  These agreements,

**14.** Account Issued by the Department of State on "Soviet Interference with Access to Berlin" in the Period March 30–July 3, 1948; DOCUMENTS ON GERMANY, *supra* note 9 at 101.

**15.** Statement Issued by the Soviet Government on Withdrawal of the Soviet Representative From the Allied Kommandatura, Berlin, July 1, 1948; DOCUMENTS ON GERMANY, *supra* note 9 at 100.

**16.** Occupation Statute Defining the Powers to be Retained by the Occupation Authorities, Signed by the Three Western Foreign Ministers, April 8, 1949; DOCUMENTS ON GERMANY, *supra* note 9 at 148.

**17.** Agreements on Merger of Three Western German Zones of Occupation in Germany and Other Matters, April 8, 1949, United States—United Kingdom—France, 63 Stat. 2817, T.I.A.S. No. 2066, 140 U.N. T.S. 196.

**18.** Agreement as to Tripartite Controls, *supra* note 17, Art. 1.

**19.** The position of United States High Commissioner for Germany was established by the President on June 6, 1949, by Exec. Order No. 10062, 14 Fed.Reg. 2965 (1949).  The order read in pertinent part:

The United States High Commissioner for Germany, hereinafter referred to as the High Commissioner, shall be the supreme United States authority in Germany.  The High Commissioner shall have the authority, under the immediate supervision of the Secretary of State (subject, however, to consultation with and ultimate direction by the President), to exercise all of the governmental functions of the United States in Germany (other than the command of troops), including representation of the United States on the Allied High Commission for Germany when established, and the exercise of appropriate functions of a Chief of Mission within the meaning of the Foreign Service Act of 1946.

**20.** Joint Resolution of Congress, 65 Stat. 451; Pres. Proclamation No. 2950, 16 Fed. Reg. 10915 (1951).

**21.** Convention on Relations between the Three Powers and the Federal Republic of Germany, May 26, 1952, 6 U.S.T. 4251, T.I.A.S. 3425, 331 U.N.T.S. 327; Convention on the Settlement of Matters Arising Out of the War and the Occupation, May 26, 1952, 6 U.S.T. 4411, T.I.A.S. 3425, 332 U.N.T.S. 219; Protocol to Correct Certain Textual Errors in the Convention on Rela-

however, did not enter into force until May 5, 1955. On that date, the occupation regime in the Federal Republic of Germany was terminated, the Allied High Commission abolished, and the Federal Republic assumed full sovereign control over its territory.[22]

The Bonn Conventions, however, did not provide for the termination of the occupation in Berlin. There, the occupation continued.

### 2. The Occupation of Greater Berlin.

On September 12, 1944, the United States, the United Kingdom and the Soviet Union, in an exercise of their anticipated rights of conquest, agreed that:

> The Berlin Area (by which expression is understood the territory of, "Greater Berlin," as defined by the Law of 27th April, 1920) will be jointly occupied by armed forces of the U.S.A., U.K., and U.S.S.R., assigned by the respective Commanders-in-Chief.[23]

A "Protocol on Zones of Occupation" divided Greater Berlin into separate sectors, each to be occupied by one of the Allied Powers. Further, an "Inter-Allied Governing Authority" (*Kommandatura* in Russian), was established "to direct jointly the administration of the 'Greater Berlin' area."[24] On November 14, 1944, in the Agreement on Control Machinery, the Allies further agreed to establish a subordinate Inter-Allied technical staff "to serve the purpose of supervising and controlling the activities of the local organs of 'Greater Berlin,' which are responsible for its municipal services."[25]

In the summer of 1945, United States, United Kingdom and French military forces moved into Berlin, which initially had been taken by Soviet military forces.[26] On July 11, 1945, the "Allied Kommandatura" was established pursuant to the agreed arrangements for Greater Berlin. Subject to the Allied Kommandatura, which was responsible for the administration of the city as a whole and for the control of local German authorities, each sector had a Military Sector Commandant who had authority to control and administer his particular sector. Each Sector Commandant also had the power to promulgate necessary sector legislation.

In the initial months after the establishment of the Allied Kommandatura, cooperation among the wartime Allies was maintained. By late 1946, however, the Soviet authorities increasingly began to obstruct the functioning of the Kommandatura and to impede the quadripartite control of Greater Berlin. Throughout 1947, relations between the Soviet

tions, June 27, 1952, 6 U.S.T. 5381, T.I. A.S. 3425.

**22.** *See* Protocol on Termination of the Occupation Regime, Oct. 23, 1954, 6 U.S.T. 4117, T.I.A.S. No. 3425, 331 U.N.T.S. 253; Convention on Relations, *supra* note 21, Art. 1.

**23.** Protocol on Zones of Occupation in Germany and Administration of "Greater Berlin", *supra* note 7, 5 U.S.T. at 2080.

**24.** *Id.*, 5 U.S.T. at 2081.

**25.** *Supra* note 8, 5 U.S.T. at 2065.

**26.** Allied Agreement on Quadripartite Administration of Berlin, July 7, 1945; DOCUMENTS ON GERMANY, *supra* note 9 at 22–23.

Union and the Western Allies continued to deteriorate and, beginning on January 6, 1948, the Soviet authorities progressively restricted access to Greater Berlin from the Western zones of occupation. By mid-June, 1948, all land ties were cut off, and the Berlin blockade was established.[27] In December, 1948, the Allied (Western) Kommandatura resumed operation on the theory that the Soviet withdrawal could not abrogate the original quadripartite agreement for joint control over Greater Berlin, even though the decisions of the Allied (Western) Kommandatura could only be given effect in the Western sectors.[28]

The Berlin blockade ended on May 12, 1949, following an agreement among the Four Powers to discuss the strained relations in the Council of Foreign Ministers.[29] When no agreement was reached by that body, the three Western Powers began to cope with a *de facto* partition of Greater Berlin between the Soviet Sector and the three Western sectors.[30] The Western Powers agreed that the agreement establishing the civilian Allied High Commission for the new German Federal Republic would "be applied as far as practicable to the Western Sectors of Berlin."[31] The internal procedure for the Allied (Western) Kommandatura was accordingly revised to make clear its subordination to the newly-created civilian Allied High Commission.[32]

On May 14, 1949, the Allied (Western) Kommandatura adopted a "Statement of Principles Governing the Relationship Between the Allied Kommandatura and Greater Berlin," which paralleled the 1949 agreements laying a foundation for later self-government by the German people in the three Western zones of occupation.[33] That Statement provided that Greater Berlin was to have "full legislative and executive and judicial powers," in accordance with its constitution and the limitations contained in the Statement. The Allied Kommandatura reserved to itself powers in certain spheres,[34] and the right to assume full authority over Berlin where "essential to security or to preserve democratic government, or in the pursuance of the international obligations of their Governments."[35] Because of the "special circumstances prevailing in Berlin," and in contrast to the Occupation Statute applicable in the three Western zones of occupation, the Statement of Principles for Berlin also

27. The ensuing airborne supply of the city became known as the "Berlin Airlift."

28. *See* Simpson, *Berlin: Allied Rights and Responsibilities in the Divided City*, 6 Int. & Comp.L.Q. 83, 86–87 (1957).

29. Four-Power Communique on Agreement on Lifting the Berlin Blockade Effective May 12, New York, May 4, 1949; DOCUMENTS ON GERMANY, *supra* note 9 at 154.

30. Simpson, *supra* note 28 at 87.

31. Agreement on Merger of three Western German Zones of Occupation, *supra* note 17; Agreed Minute Respecting Berlin.

32. Agreement on Terms for Continuance of the Allied (Western) Kommandatura as the Agency for Allied Control of Berlin, June 7, 1949; DOCUMENTS ON GERMANY, *supra* note 9 at 160.

33. DOCUMENTS ON GERMANY, *supra* note 9 at 158.

34. The Allied Kommandatura reserved to itself, *inter alia,* the right to supervise the Berlin Police, to take measures related to the Berlin blockade, and to coordinate banking, currency, and credit policies with those of the Federal Republic.

35. DOCUMENTS ON GERMANY, *supra* note 9 at 159.

reserved to the Allies "the right to intervene, in an emergency, and issue orders to ensure the security,· good order and financial and economic stability of the City."[36]  Upon notice to the Kommandatura and the failure of that body to object, the Berlin City Government was allowed to legislate on subjects within the reserved spheres.  All other city legislation would become effective, unless vetoed by the Kommandatura within 21 days.[37]

Three years later, on May 26, 1952, concurrent with the contemplated new relationship between the Western Powers and the Federal Republic of Germany, the three Western Commandants issued a "Declaration on Berlin Governing Relations Between the Allied (Western) Kommandatura and Berlin."[38]  Therein the Allied Kommandatura authorized the local Berlin authorities to exercise all rights, powers and responsibilities set forth in the Berlin Constitution as adopted in 1950, subject to certain reservations.[39]  The purpose of this Declaration, which did not enter into force until after the Bonn Conventions did on May 5, 1955, was "to grant the Berlin authorities the maximum liberty compatible with the special situation of Berlin."  The Declaration did not, as did the Bonn Conventions with respect to the Federal Republic of Germany, signal the end of the Allied occupation in Berlin.  President Eisenhower issued an Executive Order on May 5, 1955 assigning responsibility for the occupation of Berlin to the United States Ambassador accredited to the Federal Republic of Germany.[40]

The Declaration on Berlin authorized the Berlin authorities to adopt the legislation of the Federal Republic of Germany, and provided that the Allied Kommandatura would not, subject to the rights reserved to them, object to such adoption.[41]  The Declaration on Berlin further provided that the Allied authorities would only intervene in the areas specified in the May 14, 1949 Statement of Principles, in which they had reserved certain powers for themselves, to an extent consistent with the principles

---

36.  *Id.*

37.  Art. 6 of the Statement of Principles provided:

> Subject only to the requirements of their security, the Occupation Authorities guarantee that all agencies of the Occupation will respect the civil rights of every person to be protected against arbitrary arrest, search, or seizure, to be represented by council [*sic*], to be admitted to appeal as circumstances warrant, to communicate with relatives, and to have a fair, prompt trial.

38.  DOCUMENTS ON GERMANY, *supra* note 9 at 208.

39.  *Id.*, Art. I.

40.  Exec. Order No. 10608, 20 Fed.Reg. 3093, reads in pertinent part as follows:

> 1.  Executive Order No. 10062 of June 6, 1949, and Executive Order No. 10144 of July 21, 1950, amending that order, are hereby revoked, and the position of United States High Commissioner for Germany, established by that order, is hereby abolished.
>
> 2.  The Chief of the United States Diplomatic Mission to the Federal Republic of Germany, hereinafter referred to as the Chief of Mission, shall have supreme authority, except as otherwise provided herein, with respect to all responsibilities, duties, and governmental functions of the United States in all Germany.  The Chief of Mission shall exercise his authority under the supervision of the Secretary of State and subject to ultimate direction by the President.

41.  Declaration on Berlin Governing Relations Between the Allied (Western) Kommandatura and Berlin, DOCUMENTS ON GERMANY, *supra* note 9 at 209, Art. IV.

underlying the new relations between the Western Powers and the Federal Republic of Germany.[42]

Between 1955 and 1971, the Western Allies made numerous attempts to normalize "the situation" in Berlin. The diplomatic exchanges of that time between the Three Western Powers and the Soviet Union reflect the fundamentally adverse legal positions and political objectives of the two sides, and gave rise to a serious escalation of tensions in Europe.[43] These tensions peaked in mid-August, 1961, when the "Berlin Wall" was erected and circulation throughout the four sectors of Berlin was severely curtailed.[44] Thereafter, serious tensions between the West and East surfaced in Berlin in varying degrees until the conclusion, on September 3, 1971, of the Quadripartite Agreement on Berlin.[45]

In the Quadripartite Agreement, the four war-time Allies essentially agreed to disagree, while simultaneously respecting their individual and joint rights and responsibilities in Berlin, which they recognized remained unchanged. The Four Powers agreed on detailed arrangements for (1) transit traffic through the territory of East Germany and between the Western sectors of Berlin and the Federal Republic of Germany, (2) travel and visits by permanent residents of the Western sectors into areas controlled by East Germany, and (3) the maintenance and development of ties between the Western sectors of Berlin and the Federal Republic of Germany. In a letter to the Chancellor of the Federal Republic of Germany following the signing of the Quadripartite Agreement, the three Western Ambassadors noted that, pursuant to the terms of the Agreement, the rights and responsibilities of the Four Powers in Berlin remain would unaltered: "Our governments will continue, as heretofore, to exercise supreme authority in the Western Sectors of Berlin, within the framework of the Four Powers responsibility which we share for Berlin as a whole." [46]

## B. The Exercise of Judicial Authority Under the Occupation.

### 1. The Occupation Courts in Germany.

When the Allied occupation began in 1945, there were no German courts and the only semblance of law was provided by the Allied Military Command.[47] Following the establishment of a Military Government in

---

**42.** *Id.*, Art. V.

**43.** *See generally*, DOCUMENTS ON GERMANY, *supra* note 9 at 277 *et seq.*

**44.** *See* Note from the Western Commandants in Berlin to the Soviet Commandant Protesting Erection of the "Berlin Wall", August 15, 1961; DOCUMENTS ON GERMANY, *supra* note 9 at 568; Note from the United States to the Soviet Union Protesting East German violation of the Qua-

dripartite status of Berlin, August 17, 1961; Report by President Kennedy to the Nation on the Berlin Crisis, July 25, 1961, 45 Dep't State Bull. 267 (1961).

**45.** 24 U.S.T. 283, T.I.A.S. No. 7551.

**46.** 24 U.S.T. at 343.

**47.** *See* McCauley, *American Courts in Germany: 600,000 Cases Later*, 40 A.B. A.J. 1041, 1042 (1954).

the United States zone of occupation,[48] General Eisenhower proclaimed that the law applicable within the zone would be "the German law in force at the time of the occupation," subject to modification by the Allied Control Council or the U.S. Military Government.[49] Thus, with the exception of decisions by the occupying authorities to nullify all provisions of law evidencing National Socialist ideology, the basic law applied within the United States zone from the start of the occupation was German law.

In 1946, the United States Military Government took measures designed to establish a judicial system for its zone of occupation in Germany. First, the government enacted an ordinance setting forth a list of offenses against Allied Forces and supplementing the German Criminal Code of 1871 as the applicable law within the zone.[50] Second, a system of "Military Government Courts" was established.[51] Members of these courts could either be military or civilian personnel of the United States Military Government. The jurisdiction of these courts was territorial, and extended to all persons in the occupied zone, other than military personnel who were subject to military law. Third, the United States Military Government provided for a limited reopening of local German courts subject to the direction of the Military Government.[52] In general, United States occupation law denied to German courts jurisdiction over criminal and civil cases involving the Allied Forces, United Nations nationals and their dependents. Moreover, the Military Government retained broad powers to supervise and to intervene in proceedings in the local German courts.

In 1948, as part of the shift from military to civilian control of the occupation, the United States Military Governor for Germany replaced the system of Military Government courts with an integrated system of civilian courts under the Military Government.[53] German territory under United States occupation was divided into eleven judicial districts—the United States sector of Berlin comprising the "Second Judicial District". In addition, a Court of Appeals was established as a reviewing court. The judges of these "Military Government Courts for Germany" were civilians. The jurisdiction of the courts in criminal cases was similar to that of their predecessor courts.

The movement toward greater German control over the judicial system in the three Western zones of Germany and the three Western sectors of

48. Proc. No. 1, United States Area of Control, United States Military Government for Germany, July 14, 1945, 12 Fed.Reg. 6997 (1947).

49. Proc. No. 2, United States Area of Control, United States Military Government for Germany, September 19, 1945, 12 Fed. Reg. 6997 (1947).

50. Ord. No. 1, Crimes and Offenses, United States Military Government for Germany, 12 Fed.Reg. 2189 (1947).

51. Ord. No. 2, Military Government Courts, United States Military Government for Germany, 12 Fed.Reg. 2190 (1947).

52. Law No. 2, German Courts, United States Military Government for Germany, 12 Fed.Reg. 2191 (1947).

53. Ord. No. 31, United States Military Government Courts for Germany, 14 Fed. Reg. 124 (1948).

Berlin was formalized by the Allied High Commission's 1949 Law on Judicial Powers in the Reserved Fields.[54] As the title implies, the Three Powers restricted the jurisdiction of their own occupation courts to cases which they had specifically reserved to themselves in the 1949 Occupation Statute—principally, offenses committed by members of the Allied Forces and their dependents, offenses against Allied property or personnel and offenses against occupation laws. The basic provisions of the Law on Judicial Powers in the Reserved Fields were reenacted and applied to Berlin by the Allied (Western) Kommandatura.[55]

After the creation of the Allied High Commission for Germany, the United States High Commissioner promulgated a new authorizing statute, establishing the "United States Courts of the Allied High Commission for Germany," effective January 1, 1950.[56] The criminal jurisdiction of the new court system was broad; the courts were empowered to decide criminal cases arising under both occupation and German law if the offense was committed within the United States zone or the United States Sector of Berlin. Civil jurisdiction encompassed cases in which a member of the U.S. Armed Forces was a party. The functions of the United States courts of the Allied High Commission for Germany were terminated on May 5, 1955, upon the entry into force of the Bonn Conventions.

### 2. The United States Court for Berlin.

On April 28, 1955, only a few days before the occupation regime terminated in the rest of Germany, the U.S. High Commissioner promulgated Law No. 46 establishing the "United States Court for Berlin." The Law defines the jurisdiction of the Court, sets forth the applicable substantive law and provides for the appointment of judges and other principal court personnel by the United States Ambassador to the Federal Republic of Germany. Despite the fact that this Court was established in 1955, this is the first time in its 24-year history that the Court has been convened.

As previously noted, the President has delegated to the United States Ambassador to the Federal Republic of Germany his "supreme authority . . . with respect to all responsibilities, duties, and governmental functions of the United States in all Germany [including Berlin] under the supervision of the Secretary of State and subject to the ultimate direction of the President."[57] Thus, this Court sits in Berlin as an instrumentality of the United States, executing the sovereign powers of the United States. As a matter of United States law, it is a court established pursuant to the powers granted to the President by Article II of the United States Constitution.

**54.** Law No. 13, Judicial Power in the Reserved Fields, Nov. 25, 1949, 15 Fed.Reg. 1056 (1950).

**55.** Law No. 7, Judicial Powers in the Reserved Fields, Allied Kommandatura Berlin, Mar. 17, 1950, *Allied Kommandatura Gazette* 11 (1950–53).

That law is still in force today, and was referred to in the communication from the United States authorities to the Berlin Senator for Justice denying the German authorities jurisdiction in the present case. *See* note 2 *supra*.

**56.** Allied High Commission, Law No. 1, 15 Fed.Reg. 2086 (1950).

**57.** *See* note 40 *supra*.

Article 3(1) of Law No. 46 provides that "the Court shall have original jurisdiction to hear and decide any criminal cases arising under any legislation in effect in the United States Sector for Berlin if the offense was committed within the area of Greater Berlin." The criminal jurisdiction of the Court is concurrent with that of the Berlin courts, except to the extent that the American Sector Commandant withdraws jurisdiction from the German courts in a given case. Thus, the Court exercises jurisdiction which is territorial in nature. If the American authorities choose to do so, they can arraign before this Court any person physically present in the American Sector of Berlin, regardless of such person's nationality, including—when authorized by the American Sector Commandant—members of the United States Armed Forces stationed in West Berlin. Pursuant to Article 5, convictions or sentences pronounced by the Court may be reviewed by the American Ambassador to the Federal Republic.

Article 3(5) confers broad powers upon the judges appointed to this Court, including the power "to establish consistently with the applicable legislation rules of practice and proceedings" for the Court. Pursuant to that authority, on November 30, 1978, Judge Bonsal[58] promulgated as Rules of Criminal Procedure for the United States Court for Berlin a set of rules which, with one exception, adopted almost verbatim the Federal Rules of Criminal Procedure and the Federal Rules of Evidence; the exception related to jury trials. Thus, under the Rules of Criminal Procedure of this Court, the defendants here are not entitled to a trial by jury.

We now turn to the question of whether the Constitution of the United States, which might require a jury trial under these circumstances, applies to the proceedings in this Court.

## III. APPLICATION OF THE UNITED STATES CONSTITUTION TO THESE PROCEEDINGS

The Prosecution's basic position is that the United States Constitution does not apply to these proceedings because Berlin is a territory governed by military conquest. The Prosecution maintains that the question whether constitutional rights must be afforded in territories governed by United States authorities outside the United States depends on the nature and degree of association between such territories and the United States, and that the relationship between the United States and Berlin is such that the Constitution does not apply to proceedings in Berlin. Thus, the Prosecution says:

> It is appropriate to visualize a hierarchy of types of United States involvement in the governance of overseas territories. For incorporated territories, which are in many cases territories on their way toward full statehood, the full panoply of Constitutional rights is applicable. Next there are those territories, as yet unincorporated,

58. *See* note 4 *supra.*

which are guaranteed most or all Constitutional safeguards by virtue of act of Congress. Then there are unincorporated territories now governed by the *King* [v. *Morton*, 172 U.S.App.D.C. 126, 520 F.2d 1140] doctrine, where the constitutionality of Congressional failure to extend the provisions of the Bill of Rights is determined on the basis of a factual inquiry into the feasibility of applying the Bill of Rights at least as to American citizens. In all of these territories, the United States exercises sovereignty. . . .

The very last in the hierarchy of types of United States governing authority overseas is United States occupation and control pursuant to conquest. In such a situation international law prescribes the limits of the occupant's power. Occupation does not displace the sovereignty of the occupied state, though for the time being the occupant may exercise supreme governing authority. Nor does occupation effect any annexation or incorporation of the occupied territory into the territory or political structure of the occupant, and the occupant's constitution and laws do not extend of their own force to the occupied territory.

It is this last sort of authority that the United States exercises in Berlin. Significantly, the occupation is multilateral in character: the Allied Kommandatura jointly exercises supreme governing authority, with each sector commandant exercising delegated authority within his own sector. The Allies have repeatedly disclaimed any intent to annex Berlin or extend their own political systems thereto. The explicit Allied philosophy, in accordance with international law, is to provide for the security of Berlin while at the same time affording to the people of Berlin the fullest possible rights of self-government through their own institutions.[59]

As a corollary to this position, the Prosecution contends that everything which concerns the conduct of an occupation is a "political question" not subject to court review. Thus, it states in its brief:

Berlin is an occupied city. It is not United States territory. The United States presence there grows out of conquest, not the consent of the governed. The United States and the other Western Allies have, over time, made political judgments to turn over to the Berliners control of important institutions and functions of governance. But these decisions reflect political judgments, not legal necessity.[60]

The Prosecution further argues that this Court is not an independent tribunal established to adjudicate the rights of the defendants and lacks the power to make a ruling contrary to the foreign policy interests of the United States.[61] This, it contends, follows from the fact that "United

**59.** Memorandum in Opposition to Defendants' Motion Regarding the Application of the Constitution of the United States to these Proceedings, filed March 6, 1979, at 25–27 [hereinafter "Memorandum in Opposition"].

**60.** *Id.* at 28.

**61.** Alternatively, the Prosecution argues that the Court has the discretion to deny defendants' motion for a jury trial. It suggests that the Court exercise this discre-

States occupation courts in Germany have been instruments of the United States occupation policy." [62] According to the Prosecution, this political aspect was expressed by General Lucius D. Clay, the former United States Military Governor for Germany, who described his aspirations for the administration of justice in the United States area of occupation as follows:

> We were trying to make our own judicial procedures an example of democratic justice and concern for the individual. [63]

tion for several reasons. First, the Prosecution contends that a jury would be inappropriate in an occupation setting because of the historic function of a jury to oversee governmental authority. Moreover, it contends, laws which mandate participation by Berlin residents in a jury trial would require an exercise of authority unprecedented in the United States occupation of Germany. Further, implementation of a jury system would require the cooperation of local authorities unfamiliar with the assumptions underlying the jury system. Finally, the Prosecution argues, the United States authorities would have to consider whether Berliners serving as jurors might be made subject to pressures, deriving from Berlin's unique political status and geographic location, which might undermine the conduct of a fair trial.

In view of the Court's holding that the United States Constitution dictates that defendants have a right to a jury trial, it is clear that neither the Court nor the State Department has the discretion to deny that right.

**62.** Memorandum in Opposition, *supra* note 59 at 10.

**63.** *Id.* at 14.

This quotation was taken from General Clay's account of his administration of military government in Germany. L. Clay, *Decision in Germany* 249 (1950).

The full passage in which that quotation appears reads as follows:

> In the early days of the occupation the search and seizure operations of the occupying army were a handicap to Military Government efforts to re-establish a humane German judicial system. It was difficult to oppose searches for arms and to challenge the right of intelligence personnel to hunt for and seize persons believed to be security risks, particularly in view of the mandatory requirement in our directive for the arrest of dangerous Nazis. In January 1947, however, I was able to persuade the Army Command not to undertake searches without previous notice to Military Government. After some opposition in the General Staff, General McNarney approved my recommendation that further house search, except in hot pursuit, would require a warrant from a Military Government court. Later the detention of security risks for more than a few hours required the appearance of our Army intelligence personnel, making the arrest before a Military Government court, to show justification for the detention. On January 7, 1948, in a further effort to restore normal justice, the right of habeas corpus was extended to all persons other than security risks who came under the jurisdiction of Military Government courts, and in a few months was extended to include security arrests. Thus we were trying to make our own judicial procedure an example of democratic justice and concern for the individual.

The Prosecution's brief, in leaving out the word "Thus", and the paragraph which precedes it, tears General Clay's sentence out of context and obscures the fact that even from the earliest point, the Americans sought to bring the occupation of Germany into compliance with constitutional standards. Thus, as General Clay points out, within months of the silencing of the guns of war, and while the United States was still technically at war with Germany, search warrants were required, prompt arraignment of suspects before occupation courts was ordered, and even the right of habeas corpus was generally extended to the civilian population.

As noted earlier (*supra* p. 231), it was not until 1951 that the state of war was formally ended. It was not until 1955 that sovereignty was returned to the German people everywhere in the Western zones of occupation excepting, of course, Berlin. It is against this background that we must evaluate the claim of the Prosecution that the civilian German population in Berlin in 1979 may be governed by the United States Department of State without any constitutional limitation.

From the earliest point of the occupation of Germany, the Prosecution contends, the United States occupation courts functioned as an extension of American foreign policy:

> At the outset, General Eisenhower, as Supreme Commander of the Allied Forces in Germany, suspended the German Courts through Proclamation No. 1 of July 14, 1945. Twelve years of National Socialism had so affected the German judiciary that the German courts could not be entrusted with the responsibility of maintaining law and order, handling normal criminal matters, or administering impartial justice. These courts were subsequently "deNazified" and by March, 1946, all authorized German courts in the United States zone had been re-opened.[64]

Thus, the Prosecution maintains that any rights to which the defendants are entitled must be granted by Secretary of State Vance, or they do not exist at all:

> The basic point is this: a defendant tried in the United States Court for Berlin is afforded certain rights found in the Constitution, but he receives these rights not by force of the Constitution itself . . ., but because the Secretary of State has made the determination that these certain rights should be provided.[65]

Further, the Prosecution argues, such rights would be granted not because of constitutional dictates, but because they would be in accord with our longstanding foreign policy. It is said that throughout the occupation:

> the rules and procedures of the courts were revised by the occupation authorities to implement aspects of United States foreign policy, not by virtue of requirements arising under the United States Constitution or United States law.[66]

Pursuing its thesis that this Court is nothing more than an implementing arm of the United States' foreign policy, the Prosecution instructs the Court that the Secretary of State has determined, as a matter of foreign policy, that the right to a jury trial should not be afforded to the defendants. The Prosecution's brief asserts:

> The conduct of occupation is fundamentally different from the exercise of civil government in the United States. The actions of an occupying power, from necessity, may be inconsistent with the wishes or attitudes of the occupied population. In short, the assumptions and values which underlie the great common law conception of trial by jury do not necessarily have a place in the conduct of an occupation. Whether it does in a particular situation is quintessentially a political question, to be determined by the officers responsible for the United States conduct of this occupation, *and not by this Court.*[67]

---

**64.** Memorandum in Opposition, *supra* note 59 at 10–11.

**65.** *Id.* at 2.

**66.** *Id.* at 10.

**67.** *Id.* at 29 (emphasis supplied).

The Court finds the Prosecution's argument to be entirely without merit. First, there has never been a time when United States authorities exercised governmental powers in any geographical area—whether at war or in times of peace—without regard for their own Constitution. *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866). Nor has there ever been a case in which constitutional officers, such as the Secretary of State, have exercised the powers of their office without constitutional limitations. Even in the long-discredited case of *In re Ross*, 140 U.S. 453, 11 S.Ct. 897, 35 L.Ed. 581 (1891), in which American consular officers were permitted to try United States citizens in certain "non-Christian" countries, the Court made its decision under the Constitution—not in total disregard of it. The distinction is subtle but real: the applicability of any provision of the Constitution is itself a point of constitutional law, to be decided in the last instance by the judiciary, not by the Executive Branch.

This fundamental principle was forcefully and clearly announced by the Supreme Court more than a century ago in *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 120–21, 18 L.Ed. 281 (1866):

> [The Framers of the American Constitution] foresaw that troublous times would arise, when rulers and people would become restive under restraint, and seek by sharp and decisive measures to accomplish ends deemed just and proper; and that the principles of constitutional liberty would be in peril, unless established by irrepealable law. The history of the world had taught them that what was done in the past might be attempted in the future. *The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances.* No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism, but the theory of necessity on which it is based is false; for the government, within the Constitution, has all the powers granted to it, which are necessary to preserve its existence; as has been happily proved by the result of the great effort to throw off its just authority. [Emphasis added.]

Although the Supreme Court was reviewing the power of military commissions organized by military authorities in the United States during the Civil War, the wisdom of the principle set forth above is nowhere better demonstrated than in this city, during this occupation, and before this Court.

The Prosecution's position, if accepted by this Court, would have dramatic consequences not only for the two defendants whom the United States has chosen to arraign before the Court, but for every person within the territorial limits of the United States Sector of Berlin. If the occupation authorities are not governed by the Constitution in this Court, they are not governed by the Constitution at all. And, if the occupation authorities may act free of all constitutional restraints, no one in the American Sector of Berlin has any protection from their untrammeled

discretion. If there are no constitutional protections, there is no First Amendment, no Fifth Amendment or Sixth Amendment; even the Thirteenth Amendment's prohibition of involuntary servitude would be inapplicable. The American authorities, if the Secretary of State so decreed, would have the power, in time of peace and with respect to German and American citizens alike, to arrest any person without cause, to hold a person incommunicado, to deny an accused the benefit of counsel, to try a person summarily and to impose sentence—all as a part of the unreviewable exercise of foreign policy.[68]

**68.** The Prosecution's position was fully explored in oral argument when the United States Attorney for Berlin was questioned by the Court upon the assertions made in the Prosecution's brief:

THE COURT: [M]ust [the Court] take the directives of the Secretary of State?

* * * * * *

MR. SURENA: The Court cannot go beyond whatever restrictions the Department of State places upon the Court. That is not to say that the Department of State will affirmatively issue directives to the Court.

THE COURT: How will I know when you argue to me on the one hand and when you are telling me on the other?

* * * * * *

THE COURT: So that if I understand your position correctly, I have nothing to decide. I have only to obey?

MR. SURENA: You have, in our opinion, nothing to decide on the question of a trial by jury.

* * * * * *

MR. SURENA: Ultimately it is the position of the United States that the question of the applicability of the Constitution is not a question to be decided by this Court, except to decide in agreement with our interpretation that the Constitution does not, of itself, apply in these proceedings.

* * * * * *

THE COURT: Are you standing there telling me you are prosecutor, judge and jury, that you will make the rules as you wish, change them as you wish, and that all of us must do what you say?

MR. SURENA: No.

THE COURT: Well, then you are going to have to explain to me, Mr. Surena, how you do not have those powers if you are not in any way bounded by the constitution of the United States?

MR. SURENA: I think there may be a difference between having those powers and purporting to exercise them.

THE COURT: No, sir. Either you have them or you don't. And if you have them, you may exercise them at will, unbounded by any restraint. Is that what you are telling me?

MR. SURENA: If we have them, then we can exercise them in proceedings before the United States Court for Berlin, without restriction by the Constitution.

THE COURT: Is that what you are telling me, that you may do whatever you wish, and whenever you decide to withdraw your grace, you may do it, at will?

* * * * * *

THE COURT: Therefore, you are saying, are you not, that there is no right to due process in this court?

MR. SURENA: That is correct.

* * * * * *

THE COURT: American citizens are subject to the jurisdiction of this Court. Isn't that true?

MR. SURENA: They can be, yes.

THE COURT: Indeed, if the plane which was allegedly hijacked in this case had been hijacked by two Americans, the same procedures, the same proceedings and the same briefs could have been filed; is that not so?

MR. SURENA: Essentially, yes.

* * * * * *

THE COURT: Is there any guarantee that tomorrow you would not summarily arrest somebody off the street in Berlin, hold them liable for crime, and say, for example, also, I think, from Lewis Carroll, "Sentence first, trial later?" What stops you from that?

MR. SURENA: The history and jurisprudence of the Court.

THE COURT: Which, I gather, is subservient to the directions of the Secretary of State. You told me that, didn't you?

MR. SURENA: Yes.

Transcript of Proceedings of March 13, 1979, at 66-67, 69, 71, 74–75, 83–84.

This Court does not suggest that the American occupation authorities intend to carry the Prosecution's thesis to its logical conclusion. Nonetheless, people have been deceived before in their assessment of the intentions of their own leaders and their own government; and those who have left the untrammeled, unchecked power in the hands of their leaders have not had a happy experience. It is a first principle of American life—not only life at home but life abroad—that everything American public officials do is governed by, measured against, and must be authorized by the United States Constitution.

As the Supreme Court made clear in *Ex parte Milligan, supra,* the Constitution is a living document to be applied under changing circumstances, in changing conditions and even in different places. The Court finds devoid of merit the suggestion that the Prosecution has no constitutional obligations or that this Court lacks the competence to inquire into those obligations. The Constitution of the United States manifestly applies to these proceedings.

Second, the Court rejects the Prosecution's contention that, even if the Constitution applies to these proceedings, it is the State Department rather than the Court which interprets the Constitution.

It is clear, because the Constitution applies to these proceedings, that the defendants have the right to due process of law. Due process requires that if the United States convenes this Court, it must come before the Court as a litigant and not as a commander. The Secretary of State, in establishing a court, appointing a judge, and then electing to appear before it as a litigant, delegates his powers to the Court. Thereafter, the United States may, and indeed it should, press strongly for its views. It may argue them and, if it is so authorized, may appeal from an adverse decision. It may not, however, compel that its views be victorious.[69] Thus, the responsibility falls solely upon the Court to declare the requirements of the Constitution in this proceeding.

## IV. THE REQUIREMENTS OF THE CONSTITUTION IN THESE PROCEEDINGS

### A. The Question Presented

The sole but novel question before the Court is whether friendly aliens, charged with civil offenses in a United States court in Berlin, under the unique circumstances of the continuing United States occupation of Berlin, have a right to a jury trial. This Court is not concerned with the procedures to be used by a United States military commission trying a case in wartime [70] or during the belligerent occupation of enemy territory

---

**69.** Military cases provide the closest analogy to the situation presented here. The United States Court of Military Appeals has repeatedly held that, even though the judge and prosecutor are both appointed by the Executive Branch, the judge is required to remain impartial, and may not be influenced in his decision by his superi- ors. *See, e. g., United States v. Whitley,* 5 USCMA 786 (1955) (dismissal of presiding judge at court-martial proceeding for sustaining objection by defense counsel deprived defendant of a fair trial).

**70.** *Ex parte Quirin,* 317 U.S. 1, 63 S.Ct. 2, 87 L.Ed. 3 (1942).

before the termination of war.[71]  This case does not involve the theft or destruction of military property.  Nor does it involve spying, an offense against Allied military authority[72] or a violation of the laws of war.[73]  Further, this Court does not sit as an international tribunal, but only as an American court.[74]

The defendants are German citizens.  It is of no moment whether they be deemed citizens of the Federal Republic or of the German Democratic Republic because the United States is at peace with, and maintains diplomatic relations with, both states.  Thus, in law, the defendants are friendly aliens.  They are not enemy nationals, enemy belligerents or prisoners of war.[75]  The defendants are charged with non-military offenses under German law which would have been fully cognizable in the open and functioning German courts in West Berlin, but for the withdrawal of the German courts' jurisdiction by the United States Commander.[76]

The Court takes judicial notice that the occupation regime in existence in Greater Berlin in 1979 is unique in the annals of international relations.[77]  Berlin has played, and is destined to play in the future, a special role in the preservation of the free world.  The genesis of the occupation is to be found in belligerent occupation, but the relationship between the "occupiers" and the "occupied" in Greater Berlin has undergone fundamental changes since Berlin was initially occupied in 1945 by force of arms.

West Berlin today is a thriving metropolis, a center of commerce, tourism and the arts, with a civilian administration adhering to the principles of democratic self-government, and with a minimum of control exerted by the Western occupying powers.  What began as belligerent occupation of a vanquished enemy has turned into a "protective occupation" of a friendly and allied people.  West Berliners stand firmly with the Western Allies in the struggle against the tyranny and alien ideology

**71.**  *Madsen v. Kinsella*, 343 U.S. 341, 72 S.Ct. 699, 96 L.Ed. 988 (1952); *Cross v. Harrison*, 16 How. 164, 14 L.Ed. 889 (1853); *Leitensdorfer v. Webb*, 20 How. 176, 15 L.Ed. 891 (1857).

**72.**  *See* Allied Kommandatura Berlin Law No. 7 of March 17, 1950, Art. 1(b).

**73.**  *Ex parte Quirin, supra*, n. 68; *Johnson v. Eisentrager*, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950).

**74.**  *Hirota v. McArthur*, 338 U.S. 197, 69 S.Ct. 197, 93 L.Ed. 1902 (1949).

**75.**  *Johnson v. Eisentrager*, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950); *In re Yamashita*, 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499 (1946); *Homma v. Patterson*, 327 U.S. 759, 66 S.Ct. 515, 90 L.Ed. 992 (1946).

**76.**  *See* note 2 *supra*.

**77.**  The circumstances under which the present occupation continues must be considered by this Court.  It is not within the province of this, or any, court to determine when wars end or should end, or when occupations end or should end; such matters relate to the conduct of the United States' foreign policy and are non-justiciable.  *Commercial Trust Co. v. Miller*, 262 U.S. 51, 57, 43 S.Ct. 486, 67 L.Ed. 858 (1923).  Nonetheless, the talismanic incantation of the word "occupation" cannot foreclose judicial inquiry into the nature and circumstances of the occupation, or the personal rights of two defendants which are at stake.

imposed upon the territories surrounding their beleaguered island of freedom.

The Prosecution itself states repeatedly in its brief that the occupation of Berlin continues only to preserve democracy in this city. For example, the Prosecution explains:

> It was not until October 24, 1951, that President Truman proclaimed, pursuant to a joint resolution of the Congress, that the state of war between the United States and the Government of Germany had terminated on October 19, 1951. This proclamation made several points of immediate relevance to these proceedings. It noted that an American objective of the occupation was the conclusion of a treaty of peace with a united and free Germany and that this objective which the United States continued to seek had been frustrated by the Soviet Government, that the state of relations between the United States and the German people *no longer justified treatment of the latter as an enemy*, and that the rights of the United States as an occupying power in Germany deriving from conquest, remained unaffected by the termination of the state of war.

Memorandum in Opposition, *supra* at 5–6 (emphasis supplied). The Prosecution further states:

> In brief, the Western powers recognized that a termination of the occupation in Berlin along the lines of any of the proposals acceptable to the Soviet Union would result in the Berliners' *loss of freedom* and the abandonment of the immediate post-war goal of a reunified, democratic Germany. For both reasons, the United States was not prepared to accept the Soviet proposals for conclusion of a peace treaty. Instead, it has committed itself to fulfill its "fundamental political and moral obligation" to continue the occupation in order *to protect Berlin* and its long-term objective of a reunified, democratic Germany.

Memorandum in Opposition, *supra* at 7 (emphasis supplied). The Court is also told:

> The Soviet Union has never abandoned its objective of incorporating Berlin into the German Democratic Republic. The existence of this *island of democracy* outside the territory of, but surrounded by the German Democratic Republic, served as a constant psychological and political irritant to the communists.

Memorandum in Opposition, *supra* at 8 (emphasis supplied). The Court therefore rejects the Prosecution's suggestion that the obligations of the American occupation authorities to the people of Berlin are to be determined solely by rules of law applicable to belligerent occupation of enemy territories.[78]

---

**78.** The Court is mindful that a President of the United States proudly proclaimed in West Berlin in 1963:

> All free men, wherever they may live, are citizens of Berlin, and therefore, as a free man, I take pride in the words "Ich bin ein Berliner."

Remarks by President Kennedy upon signing the "Golden Book," West Berlin, June 26, 1963, DOCUMENTS ON GERMANY, *supra*, 633–34.

The parties have extensively briefed and argued whether, in the setting of this case, the Constitution requires a jury trial. For the reasons set forth below, the Court finds that none of the precedents cited are dispositive of the issue and that the Constitution requires that these defendants be afforded a trial by jury.

## B. The Extraterritorial Application of American Law

Initially the Supreme Court held that the protections of the Constitution did not extend beyond the territorial boundaries of the United States. In *In re Ross*, 140 U.S. 453, 11 S.Ct. 897, 35 L.Ed. 581 (1891), the Supreme Court held that an American citizen tried in an American consular court abroad could not invoke constitutional protections because the Constitution had no extraterritorial effect. The Court stated:

> By the Constitution a government is ordained and established "for the United States of America" and not for countries outside of their limits. The guarantees it affords against accusation of capital or infamous crimes, except by indictment or presentment by a Grand Jury, and for an impartial trial by jury when thus accused, apply only to citizens and others within the United States, or who are brought there for trial for alleged offenses committed elsewhere, and not to residents or temporary sojourners abroad. [Citation omitted.] The Constitution can have no operation in another country.

140 U.S. at 464, 11 S.Ct. at 900.

That doctrine was for all practical purposes repudiated in two distinct lines of cases in which certain constitutional rights were accorded defendants tried outside the United States. In the first line, American jurisdiction was exercised abroad on the basis of United States control of the territory in which the accused was being tried. In the second series of cases, jurisdiction was exercised abroad on the basis of the American citizenship of the accused.

In the first line of cases, the Supreme Court afforded constitutional rights to defendants according to the degree of control exercised by the United States over the territory in which the Court sat. This line is typified by the cases known collectively as the *Insular Cases.*[79]

The earliest of the *Insular Cases*—*Downes v. Bidwell*, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901), and *De Lima v. Bidwell*, 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041 (1901)—involved the lawfulness of import tariffs on goods brought into the United States from the newly acquired territo-

**79.** *De Lima v. Bidwell*, 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041 (1901); *Downes v. Bidwell*, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901); *Dooley v. United States*, 182 U.S. 222, 21 S.Ct. 762, 45 L.Ed. 1074 (1901); *Fourteen Diamond Rings v. United States*, 183 U.S. 176, 22 S.Ct. 59, 46 L.Ed. 138 (1901); *Armstrong v. United States*, 182 U.S. 243, 21 S.Ct. 827, 45 L.Ed. 1086 (1901); *Huus v. New York and Porto Rico Steamship Company*, 182 U.S. 392, 21 S.Ct. 827, 45 L.Ed. 1146 (1901); *Dooley v. United States*, 183 U.S. 151, 22 S.Ct. 62, 46 L.Ed. 128 (1901); *Dorr v. United States*, 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904); *Territory of Hawaii v. Mankichi*, 190 U.S. 197, 23 S.Ct. 787, 47 L.Ed. 1016 (1903). *See also Balzac v. Porto Rico*, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922); *Santiago v. Nogueras*, 214 U.S. 260, 29 S.Ct. 608, 53 L.Ed. 989 (1909).

ry of "Porto Rico," and left the Supreme Court sorely divided on the underlying issues. One contemporaneous commentator opined that:

> The Insular Cases, in the manner in which the results were reached, the incongruity of the results, and the variety of inconsistent views expressed by the different members of the court, are, I believe, without parallel in our judicial history. It is unfortunate that the cases could not have been determined with such a preponderance of consistent opinion as to have satisfied the profession and the country that the conclusions were likely to be adhered to by the court. Until some reasonable consistency and unanimity of opinion is reached by the court upon these questions, we can hardly expect their conclusions to be final and beyond revision.[80]

The "reasonable consistency and unanimity of opinion," lacking in the first cases, were thereafter provided in *Dorr v. United States*, 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904). The issue in that case was "whether, in the absence of a statute of Congress expressly conferring the right, trial by jury is a necessary incident of judicial procedure in the Philippine Islands, where demand for trial by that method has been made by the accused, and denied by the courts established in the islands." 195 U.S. at 139, 24 S.Ct. at 809. In the course of its opinion, the Court reiterated "that the Constitution of the United States is the only source of power authorizing action by any branch of the Federal government. 'The government of the United States was born of the Constitution, and all powers which it enjoys or may exercise must be either derived expressly or by implication from that instrument' "; 195 U.S. at 140, 24 S.Ct. at 809, citing *Downes v. Bidwell, supra.*

The Supreme Court then determined that the Philippine Islands had not been "incorporated" into the United States, and in this context, turned to the question of whether the constitutional right to jury trial would apply to trials in that territory. The *Dorr* Court held that those guarantees did not apply:

> We would even go farther, and say that most, if not all, the privileges and immunities contained in the Bill of Rights of the Constitution were intended to apply from the moment of annexation; but we place our decision of this case upon the ground that the two rights alleged to be violated in this case [rights to trial by jury and presentment by grand jury] *are not fundamental in their nature*, but concern merely a method of procedure which sixty years of practice had shown to be suited to the conditions of the islands, and well calculated to conserve the rights of their citizens to their lives, their property, and their well being.

195 U.S. at 144–45, 24 S.Ct. at 811 (emphasis supplied), *quoting from Hawaii v. Mankichi*, 190 U.S. 197, 217–18, 23 S.Ct. 787, 47 L.Ed. 1016 (1903).

---

**80.** Littlefield, *The Insular Cases*, 15 Harv. L.Rev. 169, 170 (1901).

The final major treatment of the issue was the unanimous opinion in *Balzac v. Porto Rico*, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922).[81] The Supreme Court held that the constitutional provisions regarding jury trial did not apply to the unincorporated territory of "Porto Rico" because a right to jury trial was not "fundamental" (citing *Dorr v. United States*, *supra*, 258 U.S. at 309–311, 42 S.Ct. at 347–348).

Thus, the *Insular Cases* stood for essentially two propositions: (1) With respect to territories incorporated into the United States, the Constitution applies of its own force throughout the territory, and (2) With respect to unincorporated territories, only "fundamental" constitutional rights apply. Both the Prosecution and the defendants here, however, have overlooked the fact that the *Insular Cases* examined the extent to which a criminal defendant in a territory administered or governed by the United States was the beneficiary of the rights guaranteed by the United States Constitution, *regardless of whether the United States itself was the prosecuting authority*. Thus, in *Balzac v. Porto Rico, supra*, the prosecuting authorities were local Puerto Rican authorities, and the prosecution took place in a local Puerto Rican court. The claim was that, because the United States governed Puerto Rico, the *local courts*—which applied Spanish law and procedure—were required to afford the defendant a jury trial.[82] The Supreme Court rejected this claim.

The *Insular Cases* are inopposite here. They would apply, for example, if the German courts sitting in the American Sector of Berlin were asserting jurisdiction in a criminal case and the defendants demanded rights guaranteed by the United States Constitution by virtue of the fact that the United States exercises "supreme authority" in that sector. Under such circumstances, the decision would depend on the nature of the ties between the United States Sector of Berlin and the United States. Here, however, we are not faced with the issue of whether German courts will apply the American Constitution because they sit in an area which is governed by the United States. We deal here with an *American* court. The nature of the sovereignty which the United States asserts over the territory in which a foreign court sits is not at issue. In sum, the *Insular Cases* do not apply when the United States is acting as prosecutor *in its own court*.

Even if this case paralleled the *Insular Cases*, it is not clear that the reasoning of those decisions would still be viable. The *Insular Cases* were severely criticized a little over two decades ago in *Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), a case typifying the second line of cases.[83] The Court in *Reid* considered the extent to which the constitu-

**81.** In the interim, the Court held, in *Rasmussen v. United States*, 197 U.S. 516, 25 S.Ct. 514, 49 L.Ed. 862 (1905), that the right to a jury trial applied to the territory of Alaska because it had been "incorporated" into the United States.

**82.** The United States federal court, established in Puerto Rico as early as April 12, 1900, had from its inception afforded jury trials to criminal defendants. *See* Act of April 12, 1900, c. 191, Sec. 34, 31 Stat. 84. For the qualifications of jurors in that court, see Act of June 25, 1906, c. 3542, 34 Stat. 466.

**83.** In *Reid*, the United States exercised jurisdiction over Mrs. Covert in England solely because of her American citizenship.

tional guarantees of trial by jury were applicable in proceedings before United States military tribunals against civilian dependents of military personnel stationed in a foreign country. Mr. Justice Black's plurality opinion, holding that American citizens accompanying the armed forces abroad were not subject to general court-martial jurisdiction, distinguished and disapproved the *Insular Cases* in the following language:

> The "Insular Cases" can be distinguished from the present cases in that they involved the power of Congress to provide rules and regulations to govern temporarily territories with wholly dissimilar traditions and institutions whereas here the basis for governmental power is American citizenship. . . . Moreover, it is our judgment that neither the cases nor their reasoning should be given any further expansion. The concept that the Bill of Rights and other constitutional protections against arbitrary government are inoperative when they become inconvenient or when expediency dictates otherwise is a very dangerous doctrine and if allowed to flourish would destroy the benefit of a written Constitution and undermine the basis of our government.

354 U.S. at 14, 77 S.Ct. at 1229.

The logic of Mr. Justice Black's opinion with respect to the question whether the Constitution applies abroad—or in the vernacular of the time, "whether the Constitution follows the flag"—is, in this Court's view, irrefutable and deserves to be cited at length. The Justice began by postulating the obligation which the United States owes to its citizens:

> At the beginning we reject the idea that when the United States acts against citizens abroad it can do so free of the Bill of Rights. The United States is entirely a creature of the Constitution. Its power and authority have no other source. It can only act in accordance with all the limitations imposed by the Constitution. When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land. This is not a novel concept. To the contrary, it is as old as government. It was recognized long before Paul successfully invoked his right as a Roman citizen to be tried in strict accordance with Roman law.

354 U.S. at 5–6, 77 S.Ct. at 1225.

Mr. Justice Black then referred to the relevant Constitutional provisions—Article III, section 2, and the Fifth and Sixth Amendments—and confirmed:

> The language of Art. III § 2 manifests that constitutional protections for the individual were designed to restrict the United States Government when it acts outside of this country, as well as here at home. After declaring that all criminal trials must be by jury, the section states that when a crime is "not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law

have directed." If this language is permitted to have its obvious meaning, § 2 is applicable to criminal trials outside of the States as a group without regard to where the offense is committed or the trial held. . . . The Fifth and Sixth Amendments, like Art. III, § 2, are also all inclusive with their sweeping references to "no person" and to "all criminal prosecutions."

This Court and other federal courts have held or asserted that various constitutional limitations apply to the Government when it acts outside the continental United States. While it has been suggested that only those constitutional rights which are "fundamental" protect Americans abroad, we can find no warrant, in logic or otherwise, for picking and choosing among the remarkable collection of "Thou shalt nots" which were explicitly fastened on all departments and agencies of the Federal Government by the Constitution and its Amendments. Moreover, in view of our heritage and the history of the adoption of the Constitution and the Bill of Rights, it seems peculiarly anomalous to say that trial before a civilian judge and by an independent jury picked from the common citizenry is not a fundamental right.

354 U.S. at 7–9, 77 S.Ct. at 1225–1226.

As regards the continued vitality of the doctrine enunciated in *In re Ross, supra*, Mr. Justice Black said:

The *Ross* case is one of those cases that cannot be understood except in its peculiar setting; even then, it seems highly unlikely that a similar result would be reached today. . . .

The *Ross* approach that the Constitution has no applicability abroad has long since been directly repudiated by numerous cases. That approach is obviously erroneous if the United States Government, which has no power except that granted by the Constitution, can and does try citizens for crimes committed abroad. Thus the *Ross* case rested, at least in substantial part, on a fundamental misconception and the most that can be said in support of the result reached there is that the consular court jurisdiction had a long history antedating the adoption of the Constitution. * * * At best, the *Ross* case should be left as a relic from a different era.[84]

354 U.S. at 10–12, 77 S.Ct. at 1227–1228.

---

84. In a footnote, Mr. Justice Black quoted with approval the views of two former Secretaries of State—Blaine and Seward—on the almost unlimited powers which had been conferred in earlier times on consular courts:

Secretary of State Blaine referred to these consular powers as "greater than ever the Roman law conferred on the pro-consuls of the empire, to an officer who, under the terms of the commitment of this astounding trust, is practically irresponsible." S.Exec.Doc. No. 21, 47th Cong., 1st Sess. 4. Seward, at a time when he was Consul-General, declared: "[t]here is no reason, *excepting the absence of appropriate legislation*, why American citizens in China, charged with grave offenses, should not have the privilege of a trial by jury as elsewhere throughout the world where the institution of civilization prevails." Id., at 7.

354 U.S. at 10, n. 16, 77 S.Ct. at 1228 (emphasis in original).

## C. The Fundamental Nature of the Right to Trial by Jury

In addition to holding that the Constitution applied abroad when American *citizens* were on trial in areas under American control, the plurality of the *Reid* court also questioned the premise of the holdings in the *Insular Cases* that trial by jury in criminal cases was not "fundamental" in American law. That premise was thereafter authoritatively voided in *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

In *Duncan,* a constitutional challenge was made to a Louisiana statute which classified a simple battery as a misdemeanor, punishable by a maximum of two years' imprisonment and a fine, and which authorized trial on such charges by the court alone. The Supreme Court canvassed the common-law development of the jury and the constitutional history of the jury trial right. The purpose of a trial by jury, as noted in *Duncan,* is to prevent government oppression by providing a "safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge." 391 U.S. at 156, 88 S.Ct. at 1451. The Court continued:

> Of course jury trial has "its weaknesses and the potential for misuse," [citations omitted]. We are aware of the long debate . . . as to the wisdom of permitting untrained laymen to determine the facts in civil and criminal proceedings. . . . [A]t the heart of the dispute have been express or implicit assertions that juries are incapable of adequately understanding evidence or determining issues of fact, and that they are unpredictable, quixotic, and little better than a roll of dice. Yet, the most recent and exhaustive study of the jury in criminal cases concluded that juries do understand the evidence and come to sound conclusions in most of the cases presented to them and that when juries differ with the result at which the judge would have arrived, it is usually because they are serving some of the very purposes for which they were created and for which they are now employed.

391 U.S. at 156–57, 88 S.Ct. at 1451–1452. The Court concluded that because trial by jury in serious criminal cases is *"fundamental to the American scheme of justice,"* *id.* at 149, 88 S.Ct. at 1447, and essential to due process of law, a state criminal defendant had the right to a jury trial in any case, which, if tried in a United States court, would require a jury under the Sixth Amendment.

The *Duncan* Court's characterization of a jury trial as "fundamental" has implications which affect an American court sitting in Germany as well as one sitting in the United States. The combined holdings of *Reid* and *Duncan* dictate that, absent the most extraordinary circumstances, the rights accorded defendants tried in *American courts* abroad should not differ from those accorded defendants tried in American courts in the United States. It is apparent—despite the fact that this Court has never before been convened—that there are no extraordinary circumstances present here. The defendants are *civilians,* who are charged with serious, *but non-military,* offenses and who are being tried in times of peace.

Thus, it is not permissible to treat them differently than any other civilian charged before an American court with committing a felony unrelated to war or espionage.

## D. The Significance of the Nature of the Tribunal

The Prosecution argues, however, that *Duncan* is inapplicable here because this Court is a type of military commission and defendants tried by a military commission have no right to a jury trial. In support of this contention, the Prosecution relies principally on *Ex parte Quirin*, 317 U.S. 1, 63 S.Ct. 2, 87 L.Ed. 3 (1942) and *Madsen v. Kinsella*, 343 U.S. 341, 72 S.Ct. 699, 96 L.Ed. 988 (1952). Although both cases are unquestionably relevant to these proceedings, they do not support the Prosecution's contention.

In *Ex parte Quirin*, 317 U.S. 1, 63 S.Ct. 2, 87 L.Ed. 3 (1942), the Supreme Court considered habeas corpus petitions filed by German saboteurs who, in the summer of 1942, landed from German submarines on the Eastern seaboard of the United States armed with explosives and instructions from an officer of the German High Command to destroy American war industries and facilities. *Id.* at 21, 63 S.Ct. at 7. They were apprehended and placed on trial before a military commission convened by the President specifically to try the petitioners, *id.* at 21–22, 63 S.Ct. at 7–8, on charges, among others, that they, "being enemies of the United States and acting for  .   .   .   the German Reich, a belligerent enemy nation, secretly and covertly passed, in civilian dress, contrary to the law of war, through the military and naval lines and defenses of the United States  .   .   .   and went behind such lines, contrary to the law of war, in civilian dress  .   .   .   to destroy certain war industries, war utilities and war materials within the United States." *Id.* at 36, 63 S.Ct. at 15.[85] Petitioners contended that the President had no authority to order that they be tried by a military commission for the crimes with which they were charged, that they were entitled to be tried by civil courts, and that the rights accorded by the Fifth and Sixth Amendments, including the right to trial by jury, were applicable to them.

The Supreme Court decided only the question "whether it is within the constitutional power of the National Government to place petitioners upon trial before a military commission *for the offenses with which they are charged.*" *Id.* at 29, 63 S.Ct. at 11 (emphasis supplied). The Court extensively reviewed the history of trials of violations of the laws of war, including trials held before the Constitution was enacted,[86] and found that "these petitioners were charged with *an offense against the law of war which the Constitution does not require to be tried by jury.*" *Id.* at 29, 63 S.Ct. at 11 (emphasis supplied). The Court held that:

---

**85.** Petitioners were charged with (1) Violation of the Law of War; (2) Violation of Article 81 of the Articles of War, defining the offense of relieving or attempting to relieve, or corresponding with or giving intelligence to, the enemy; (3) Violation of Article 82, defining the offense of spying; and (4) Conspiracy to commit the offenses alleged in charges 1, 2 and 3. 317 U.S. at 23, 63 S.Ct. at 8.

**86.** *See* 317 U.S. at pp. 29–46, especially n. 14, 63 S.Ct. at 11–20.

[T]he Fifth and Sixth Amendments did not restrict whatever authority was conferred by the Constitution to try *offenses against the law of war* by military commission, and that *petitioners, charged with such an offense* not required to be tried by jury at common law, were lawfully placed on trial by the Commission without a jury.

317 U.S. at 45, 63 S.Ct. at 19 (emphasis supplied).

The Court did not hold, as the Prosecution contends, that the *Quirin* petitioners need not be accorded trial by jury because the petitioners were being tried by a military commission rather than a civil court. If the Court intended such a holding, its long and thorough analysis of the history of trials of individuals tried for similar offenses would be entirely superfluous. Rather, the Court held that petitioners were not entitled to a jury trial because they were charged with violations of the laws of war. *Quirin* does *not* stand for the proposition that the nature of the tribunal dictates whether defendants must be accorded a trial by jury or that individuals tried before a military commission are never entitled to a jury. *Quirin* holds that whether an individual is entitled to a jury trial is determined by the nature of the crime with which he is charged.[87]

The defendants here are not charged with violations of the laws of war. They are neither enemy aliens nor associated with the armed forces of an enemy. The defendants are friendly aliens charged with what may be characterized as "garden-variety" felonies in times of peace. Thus, under *Quirin*, neither the nature of this tribunal nor the crimes with which these defendants are charged permits this Court to deny the defendants a jury trial.

In *Madsen v. Kinsella*, 343 U.S. 341, 72 S.Ct. 699, 96 L.Ed. 988 (1952), the Supreme Court addressed a petition for a writ of habeas corpus filed by the wife of an air force lieutenant stationed in Germany who, in 1949, had been convicted of murdering her husband by the United States Court of the Allied High Commission for Germany, a predecessor of this Court.[88] Mrs. Madsen challenged the jurisdiction of the court which convicted her, contending that she could only be tried by a regularly convened United States general court-martial. The issue before the Supreme Court was:

> whether a United States Court of the Allied High Commission for Germany had jurisdiction, in 1950, to try a civilian citizen of the United States, who was the dependent wife of a member of the United States Armed Forces, on a charge of murdering her husband in violation of § 211 of the German Criminal Code. The homicide occurred in October, 1949, within the United States Area of Control in Germany.

---

**87.** This interpretation of *Quirin* draws further support from the fact that the Supreme Court rejected the claim of one of the *Quirin* petitioners that, as a naturalized citizen of the United States, he was entitled to a jury trial in a civilian court. The Court stated: "Citizenship in the United States of an enemy belligerent does not relieve him from the consequences of a belligerency which is unlawful because in violation of the law of war." 317 U.S. at 37, 63 S.Ct. at 15.

**88.** *See* discussion *supra* pp. 236–237.

343 U.S. 342–43, 72 S.Ct. at 700. The Court concluded that the military commission had jurisdiction over Mrs. Madsen.

The Court traced the history of United States military commissions and other United States tribunals in the nature of such commissions. Its discussion of the United States Military Government Courts for Germany, which became the United States Courts for the Allied High Commission for Germany, referred to the procedures used in those courts and included the following footnote:

> They did not provide for juries. The presentment or indictment of a grand jury required in a federal capital case by the Fifth Amendment to the Constitution of the United States, under the terms of that Amendment, has no application to "cases arising in the land or naval forces . . . ." The right of trial by jury required in federal criminal prosecutions by the Sixth Amendment is similarly limited. See *Ex parte Quirin*, 317 U.S. 1, 40, 43–45, 63 S.Ct. 2, 87 L.Ed. 3; *Ex parte Milligan*, 4 Wall. 2, 123, 138, 18 L.Ed. 281.

343 U.S. at 360 n. 26, 72 S.Ct. at 710. The Prosecution seizes upon this footnote as conclusive authority that the Constitution does not require a jury trial in this Court.

In this Court's view, however, *Madsen v. Kinsella* does not support the Prosecution's thesis that a jury trial is never required in an occupation court. First, the statement of the issue in *Madsen*, as formulated by the Supreme Court, clearly indicates that the question of Mrs. Madsen's right to a trial by jury was neither presented nor considered. She never claimed the right to trial by jury. Indeed, Mrs. Madsen's claim was that she should have been tried by a general court-martial, pursuant to the Articles of War,[89] which did *not* provide for trial by jury.

Second, the Court's reference to the absence of jury trials before occupation courts in Germany in 1949 is hardly dispositive of the issue here.[90] Because *Madsen* was decided long before *Duncan v. Louisiana* declared the right to trial by jury to be a "fundamental" right under the

---

**89.** Between 1916 and the 1957 Supreme Court decision in *Reid v. Covert*, American civilians accompanying the armed forces abroad were subject to general court martial pursuant to Articles 2 and 12 of the Articles of War. See *Madsen, supra*, 343 U.S. at 350–52, 72 S.Ct. at 705–706.

**90.** Having juries sit in criminal trials in occupation courts in Germany is not so unheard of as the Prosecution would make the Court believe. The Prosecution suggests that a jury trial might impact politically on the relationship between the United States and its two Western Allies, although the nature of that impact has not been enunciated.

The Court notes that the British, with whom we share centuries of legal tradition, regularly afforded to British citizens, tried before their Military Government courts in Germany, the right to trial by jury. See British Ordinance No. 68, 17 Military Government Gazette (British Zone of Control) 437; 26 *id.* 921; 16 Official Gazette of the Allied High Commission for Germany 179. Under this Ordinance, British subjects were entitled to be tried by a jury consisting of seven British subjects in cases involving criminal charges for which the maximum penalty was death or a sentence of imprisonment exceeding five years.

Constitution, *Madsen* certainly cannot be considered conclusive authority that the Constitution does not require a jury trial in this Court in 1979.[91]

Finally, when Mrs. Madsen was tried, the United States and Germany were technically still at war.[92] The Constitution does not require that the "enemy" be accorded self-government or be taken into the bosom of the occupation authority. Occupation courts need not share their jurisdiction with "enemy" aliens, nor are "enemy" aliens to be permitted to nullify the provisions or proceedings of any arm of the occupation government.

However, "occupations" which survive not merely hostilities but also belligerency, and which are maintained to "protect" the occupied and to preserve *their* democratic institutions, are of an altogether different kind. Such occupations are asserted not *against* but *on behalf of* the "occupied." Such occupation authorities are not viewed as military representatives of a hostile power bivouacked in the Town Square; rather, they are benign forces of protection—like the police or military of the occupied country itself. Their role as protectors gives them no license to abuse the inhabitants. The Constitution of the United States does not permit an American policeman or an American soldier to disregard the rights of those on whose behalf they stand watch.

## E. Use of Jury Trials in Previous United States Occupation Courts

The history of similar occupations in the post-World War II era demonstrates that no American court, when the issue has been raised, has denied the right to trial by jury in a non-hostile, non-belligerent area. In two unreported decisions rendered by the United States District Court for the District of Columbia, *Ikeda v. McNamara*, H.C. 416–62, October 19, 1962; and *Nicholson v. McNamara*, H.C. 141–61, November 19, 1963, the court held under circumstances similar to these that the absence of a jury system in the civil administration courts in Okinawa invalidated criminal convictions of American citizens charged with civil-type offenses.

This Court reviewed the complete records in those cases closely. The records show that Okinawa, the principal island in the Ryukyu chain, was taken from Japan in the last battle of World War II. After cessation of hostilities, military government units carried out governmental functions in areas under their control. On April 28, 1952, Japan entered into a peace treaty with the Allied Powers, including the United States. Article 3 of the treaty provided:

> Japan will concur in any proposal of the United States to the United Nations to place under its trusteeship system, with the United States as the sole administering authority  *  *  *  [the Ryukyu

**91.** It is also interesting to note that, when the Court made its passing reference to the lack of jury trials in the occupation courts in Germany, it was discussing its conclusion that "[t]he United States Courts of the Allied High Commission for Germany were, at the time of the trial of petitioner's case, tribunals in the nature of military commissions *conforming to the Constitution and laws of the United States.*"  343 U.S. at 356, 72 S.Ct. at 707–708 (emphasis supplied).

**92.** The state of belligerency between the United States and Germany was not terminated until 1951. *See* page 231 *supra.*

island]. Pending the making of such a proposal and affirmative action thereon, the United States will have the right to exercise all and any powers of administration, legislation and jurisdiction over the territory and inhabitants of these islands, including their territorial waters.

8 U.S.T. 3169, 3172–3, T.I.A.S. No. 2490.

On June 5, 1957, President Eisenhower issued Executive Order 10713,[93] which provided for a dual system of government for the Ryukyus, consisting of a civil administration under the jurisdiction of the Secretary of Defense, and a legislature directly elected by the inhabitants of the islands.

The Executive Order further provided for a dual system of courts, one system to be maintained by the Government of the Ryukyus and a separate system to be run by the United States Civil Administration. The Ryukyuan courts had criminal jurisdiction:

over all persons except (a) members of the United States forces for the civilian component, (b) employees of the United States even though not subject to trial by courts-martial  *  *  *, and (c) dependents of the foregoing [except for dependents "who are Ryukyuans"].

The U.S. Civil Administration Courts had criminal jurisdiction over persons in the excepted classes. In addition the High Commissioner could withdraw criminal jurisdiction from the Ryukyuan courts in cases affecting "the security, property, or interests of the United States."

Although the United States administered governmental functions, including judicial functions, in the Ryukyus pursuant to the Peace Treaty, it continued to recognize those islands as "a part of the Japanese homeland and looked forward to the day when the security interests of the Free World will permit their restoration to full Japanese sovereignty." [94]

In *Ikeda v. McNamara, supra,* the petitioner Ikeda, an American citizen, was charged in the U.S. Civil Administration Court with fraud under Article 246 of the Penal Code of Japan. While in confinement awaiting trial, Ikeda brought a habeas corpus action in the United States District Court in Washington against the Secretary of Defense, arguing that Executive Order 10713 and its implementing regulations did not provide for indictment and jury trial, and that therefore, he was being denied his constitutional right to a jury trial. The district court, in a brief order issued on October 19, 1962, concluded:

2. The denial to the petitioner of trial before a court of [sic] indictment by grand jury as required by the Fifth Amendment to the

---

**93.** 22 Fed.Reg. 4007.

**94.** *Public Papers of the Presidents-John F. Kennedy,* 1962, 247-48 (1963) (Statement of Mar. 19, 1962). For similar statements see 47 Dep't State Bull. 770 (1962) (referring to "the anticipated eventual restoration of these islands to Japanese administration").

Constitution, and of a trial by jury as required by Article III, Section 2, clause 3 of the Constitution and the Sixth Amendment thereto, is in violation of the petitioner's constitutional rights.

3. The detention of the petitioner by the respondent is therefore contrary to law and an order should be entered discharging the petitioner from the custody of the respondent.

In *Nicholson v. McNamara, supra,* an American citizen, the wife of a member of the armed forces, was tried and convicted in a U.S. Civil Administration Court in Okinawa on charges of killing her husband. Mrs. Nicholson sought relief in the United States District Court in Washington, alleging that her non-jury trial had been in violation of her constitutional rights.

In a memorandum opinion issued on November 15, 1963, the district court stated:

This Court is of the opinion that the confinement of Mrs. Nicholson pursuant to an information charging her with a capital offense, and her subsequent trial and conviction by a court without a jury, was in violation of her rights under Article III, Section 2, clause 3, and the Fifth and Sixth Amendments to the Constitution.

See *Ikeda v. McNamara,* H.C. 416–62.

The United States did not appeal either of these cases. Rather, by an ordinance promulgated by the High Commissioner of the United States Civil Administration of the Ryukyu Islands in 1963, the local "Code of Penal Law and Procedure" was amended to provide for indictment and jury trial.[95] The Code, as thus amended, remained in effect until 1972, when the United States terminated its occupation of the Ryukyus.

A sequel to the institution of jury trials in the occupation courts in Okinawa was *Rose v. McNamara,* 126 U.S.App.D.C. 179, 375 F.2d 924, *cert. denied,* 389 U.S. 856, 88 S.Ct. 70, 19 L.Ed.2d 121 (1967). Mrs. Rose, who was convicted in the occupation court following a jury trial for evasion of the Ryukyu Islands income tax, sought to have her conviction set aside in the United States District Court for the District of Columbia on the grounds that (1) the court in which she was tried was not established pursuant to Article III of the Constitution, and (2) her jury was not composed entirely of American citizens. The Court of Appeals found her contentions to be without merit and affirmed the dismissal below.

The Prosecution here seeks to distinguish the Okinawa cases by arguing that the authority exercised by the United States in establishing the U.S. Civil Administration Courts in Okinawa was not derived from rights of

---

**95.** The amendments to the Code of March 8, 1963 read as follows:

Chapter 5. Indictment and Jury Trial

1.5.1 <u>Right to Indictment and Trial by Jury</u>. Any person charged with an offense before a Civil Administration Court shall have the right to indictment by the grand jury as to any offense which may be punished by death or imprisonment for a term exceeding one year and trial by petit jury as to any offense other than a petty offense in accordance with the provisions of this chapter.

belligerent occupation but from the Treaty of Peace with Japan.[96] The Court finds this distinction unconvincing. In *Ikeda* and *Nicholson* the government relied *exclusively* on its rights under the laws of occupation. Each case was argued and decided solely on these grounds. In fact, the Court of Appeals in *Rose v. McNamara, supra,* 375 F.2d at 927 n. 4, suggested that the convictions in *Ikeda* and *Nicholson* would have been unconstitutional had defendants been denied a jury trial.

It is thus clear that the United States has employed juries in trials held in occupied territories after World War II after the termination of the state of war, albeit in obedience to judicial decisions.

## F. Constitutional Rights Afforded to Aliens

Finally, the Prosecution seeks to distinguish most prior decisions dealing with the rights of an accused in occupation courts from the instant proceeding on the ground that the prior adjudications concerned the rights to be afforded to American citizens, whereas the defendants here are aliens.

Although it is true that most of the cases discussed concerned prosecutions of American citizens abroad, the Court finds the purported distinction unpersuasive in the context of a trial of friendly aliens, accused of non–military offenses, in Berlin in 1979. The Prosecution conceded in oral argument that in its view aliens, as well as citizens, enjoyed the same "non-rights" in this Court; that is, neither need be afforded a trial by jury.[97] More importantly, whatever distinction may still be permissible between citizens and friendly aliens in civil cases,[98] the Fifth Amendment to the Constitution requires, in terms admitting of no ambiguity, that "no *person* " shall be deprived of life or liberty without due process of law; similarly, the Sixth Amendment protects all who are *"accused"*, without qualification. Finally, it appears to the Court that the United States is precluded from treating these defendants less favorably than United States citizens, not only by its own Constitution, but also by an international agreement to which the United States is a party.

Article 15, paragraph 2, of the Convention on Offenses and Certain Other Acts Committed on Board Aircraft (The Tokyo Convention) provides in part that—

> [A] Contracting State in whose territory a person has been disembarked  *  *  *, or delivered [by the aircraft commander], or has

---

**96.** Memorandum on the United States Civil Administration of the Ryukyu Islands: Trial by Jury, filed March 6, 1979, at 8–10.

**97.** See note 68 *supra.*

**98.** *See, e. g., Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (aliens may not be excluded from state welfare benefits); *Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973) (aliens may not be excluded from a state's civil service); *In re*

*Griffiths,* 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973) (aliens may not be barred from practicing law); *Examining Bd. v. Flores de Otero,* 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976) (aliens may not be barred from the engineering profession); *Nyguist v. Mauclet,* 432 U.S. 1, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977) (aliens may not be denied state education benefits). *But see Foley v. Connelie,* 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978) (aliens may be excluded from the state police force).

disembarked and is suspected of having committed an act [of hijacking], shall accord to such person treatment which is no less favorable for his protection and security than that accorded to nationals of such Contracting State in like circumstances.[99]

In its transmittal of the Tokyo Convention to the United States Senate for its advice and consent, the Executive Branch explained the meaning of the phrase "treatment which is no less favorable for his protection and security than that accorded to nationals of such Contracting State" in the following manner:

> By this formulation it is intended that persons in any form of custody or otherwise subject to the law of Contracting States should be entitled to avail themselves of the provisions of law of the State relating to the protection of nationals.[100]

The testimony of the representative of the Department of State in Congressional hearings on the Tokyo Convention supports the conclusion that this provision should be interpreted broadly as requiring the United States "to accord the Offender all the rights and privileges that any criminal would have in this country."[101] Indeed, the language of Article 15(2) was originally proposed by the United States delegation to the 1963 International Conference on Air Law, which approved the Tokyo Convention.. At that time, the United States explained that the purpose of the proposed language was:

> To guarantee that any person who is subjected to any type of investigation or placed under any type of custody in a Contracting State is granted the same protection of his rights and immunities as nationals of such Contracting State.[102]

Therefore, this Court believes that these defendants should be afforded the same constitutional rights that the United States would have to afford its own nationals when brought before this Court.

In sum, this Court does not hold that jury trials must be afforded in occupation courts *everywhere* and under *all* circumstances; the Court holds only that if the United States convenes a United States court in Berlin, under the present circumstances, and charges civilians with non-military offenses, the United States must provide the defendants with the same constitutional safeguards that it must provide to civilian defendants in any other United States court.

99. Convention on Offenses and Certain Other Acts Committed on Board Aircraft, September 14, 1963, 20 U.S.T. 2941; T.I.A.S. 6768; 704 U.N.T.S. 219.

100. Senate Exec.Doc.L., 90th Cong., 2d Sess. 13 (1968).

101. Senate Comm. on Foreign Relations, Convention on Offenses Committed on Board Aircraft, S.Exec.Rept. No. 3, 91st Cong., 1st Sess. 20 (1969) (Statement of Murray J. Bellman, Deputy Legal Adviser, Department of State).

102. I.C.A.O. International Conference on Air Law, Proposal of The United States of America, Doc. No. 59,208, I.C.A.O. Doc. 8565–LC/152–2 (1963).

## VI

Finally, the Court must address the Prosecution's suggestion that if the Court were to order a jury trial, the United States occupation authorities in Berlin may not implement the Court's order. The Prosecution states:

> These [jury questions] are all clearly matters within the exclusive purview of the Executive authorities—that is, the United States occupation authorities in Berlin—to consider and decide. They involve, foremost, policy questions on the conduct of the United States in the continuing occupation in Berlin.
>
> Without going further into the question of basic mechanics of directing a jury system, we submit with all due respect that because this Court lacks power to establish a jury system, both as a practical and as a political matter, it is simply not possible for a jury to be ordered in this case.[103]

Whether Law No. 46 empowers this Court to issue whatever process is necessary to select, summon and empanel a jury is academic. The Court will not issue directives to the civilian population in the American Sector of Berlin which might be countermanded by the United States occupation authorities. The civilian population should not be subjected to inconsistent directives.

Pursuant to the authority vested in this Court by Article 3(5) of Law No. 46, the Court will simply amend the "Rules of Criminal Procedure for the United States Court for Berlin," originally promulgated on November 30, 1978, to provide for trial by jury, and will direct the Clerk of the Court that 500 veniremen drawn from a cross-section of the German population of the United States Sector of Berlin be summoned to appear at the start of the trial in May. Unless the United States occupation authorities state on the record that they will comply with, and implement the Court's directive, the charges lodged against these defendants will be dismissed.

## APPENDIX

### OFFICE OF THE U. S. HIGH COMMISSIONER
### FOR GERMANY
### BERLIN ELEMENT
(United States Sector)
### LAW No. 46
United States Court for Berlin

The United States High Commissioner enacts as follows:

### ARTICLE 1
United States Court

A United States Court for Berlin (herein referred to as "the Court") is hereby established for the United States Sector of Berlin.

---

103. Memorandum of the United States Regarding the Selection of a Petit Jury, filed March 6, 1979, at 4.

## ARTICLE 2
### Personnel

1.  The Court shall be composed of one or more United States Judges for Berlin. Any such Judge may sit as the United States Court for Berlin.

2.  A United States Attorney for Berlin *and such Special Assistant United States Attorneys for Berlin as may be necessary*[1] shall be responsible for the prosecution of all cases in the Court.

3.  A Clerk-Marshal of the United States Court for Berlin shall be authorized to authenticate documents, to affix the seal of the Court, to administer oaths, to summon witnesses and to enforce the orders of the Court.

4.  United States Judges for Berlin and,[2] the United States Attorney for Berlin *and any Special Assistant United States Attorneys for Berlin*[3] shall take the following oath before performing the duties of their respective offices:

> "I swear (or affirm) that I will at all times administer justice without fear of favor to all persons of whatever creed, race, color, or political opinion they may be, that I will do equal right to the poor and to the rich and that I will faithfully and impartially discharge and perform all the duties incumbent upon me as _____ according to law and to the best of my abilities and understanding (So help me God)."

The United States Commander Berlin shall administer the oath.

5.  The personnel described in paragraphs 1 to 3 shall be appointed by the Chief of Mission, who may terminate such appointment at any time. As used in this Law the term "Chief of Mission" means the United States High Commissioner for Germany as well as the chief of the United States diplomatic mission in Germany. *The Court may appoint such reporters, interpreters or other personnel of the United States Court for Berlin as may be required. The United States Attorney for Berlin may appoint such Assistant Prosecuting Officers or other persons as may be necessary to assist him or any Special Assistant United States Attorney in the prosecution of cases in the Court. All such persons appointed by the Court or by the United States Attorney for Berlin shall take the oath prescribed in Section (4) of this article before performing the duties of their respective offices. The oath shall be administered by the Court for such persons as it appoints and by the United States Attorney for Berlin for such persons as he appoints.*[4]

1.  Amendment added by Ordinance Amending United States High Commissioner Law No. 46, United States Court for Berlin, done at Berlin, 1 November 1978, Allied Kommandatura Berlin Gazette, Supp. 98, Page 1220.

2.  Ibid.

3.  Ibid.

4.  Ibid.

## ARTICLE 3
### Jurisdiction

1. Subject to the provisions of paragraph 2 the Court shall have original jurisdiction to hear and decide any criminal case arising under any legislation in effect in the United States Sector of Berlin *if the offense was committed within the area of Greater Berlin.*[5]

2. Military, Naval or Air Force personnel of the Armed Forces of the United States shall not be brought to trial for any offense in or be subject to the powers of the Court except upon the authorization of the Commander-in-Chief, United States Army, Europe.

3. The Court may impose any penalty which is authorized by any law under which the accused is convicted.

4. In addition to or in lieu of any power of sentence herein authorized, the Court shall make such order as is authorized by law:

   (a) concerning any property or business involved in an offense; or

   (b) concerning the person of the accused.

5. Subject to the provisions of paragraph 2 any United States Judge for Berlin shall have power to administer oaths, to punish for contempt of court (whether or not committed in their presence), to compel the attendance of witnesses and order their detention, to compel the production of documents, to take depositions and to issue commissions for the taking thereof, to issue warrants of arrest and for search and seizure, to admit to bail, to commit for trial, to establish consistently with applicable legislation rules of practice and proceedings, and to exercise all other powers incidental to the performance.

6. A record shall be made and kept of all proceedings before the Court. Findings of fact and conclusions of law shall be made in all cases decided by the Court except in cases in which a plea of guilty has been accepted.

7. The Court shall have the power to modify or amend its findings, sentence or judgment, and to order a new trial if required in the interest of justice. A motion for a new trial based on the ground of newly-discovered evidence shall be made not later than two years after final judgment. A motion for a new trial based on any other ground shall be made within five days after judgment or within such further time as the Court may fix during the five-day period. The Court may correct an illegal sentence at any time and may reduce a sentence within sixty days after sentence is imposed. Clerical mistakes in judgments, orders or other parts of a record and errors in the record arising from oversight or omission may be corrected by the Court at any time and after such notice, if any, as the Court orders.

---

**5.** Amendment added by Ordinance Amending United States High Commissioner Law No. 46, United States Court for Berlin, done at Berlin, 19 October 1955, Allied Kommandatura Berlin Gazette, Supp. 75, Page 1083.

*8. Subject to the provisions of paragraph 2 of the United States Commander Berlin may empower officials other than United States Judges for Berlin to issue warrants of arrest, and for search and seizure, to compel the attendance of witnesses and the production of documents, to admit to bail (except in the case of murder), to administer oaths and to commit for trial.[6]*

## ARTICLE 4
### Process

Process, which shall include summons, subpoena and other writs provided for issuance by the Court, shall be in such form as any United States Judge for Berlin may prescribe and shall run throughout the United States Sector of Berlin.

## ARTICLE 5
### Review of Decisions

1. Any defendant may petition the Chief of Mission to review the conviction or sentence pronounced by the Court or both. Such petition shall be filed within thirty days from the entry of the final order or within such extended time as the Chief of Mission may allow.

2. Upon such review, the Chief of Mission may affirm, vacate or modify the findings, judgment or sentence of the Court in whole or in part and may order a new trial. He may refer the petition to a board to advise him on the matter.

## ARTICLE 6
### Cases Removed or Transferred from German Courts

1. Power conferred upon the Court under this Law may be exercised by the Court in any case removed, transferred or referred to the Court under the provisions of Allied Kommandatura Law No. 7. In any case so transferred from a German court the Court may suspend for a definite period or an indefinite period, declare null and void or invalidate as of any date, in whole or in part, any proceedings, de novo or otherwise, with trial, adjudication or other appropriate dispositions of such case.

2. The Court shall have in any case removed, referred or transferred to them from a German court, in addition to the jurisdiction otherwise conferred by this Law, all jurisdiction over persons and subject matter which, under German law, the German court in which the case was originally instituted would have had but for the provisions of Allied Kommandatura Law No. 7 and the exercise of powers thereunder. In addition, the Court shall have the power to determine the jurisdiction of the German court over persons and subject matter in the case so removed.

6. Ibid.

## ARTICLE 7

### Repeals and Transitional Provisions

1. United States High Commissioner Law No. 20 is hereby repealed, within the United States Sector of Berlin, provided that this repeal shall not affect the disposition of any case pending on the effective date of this Law in a court established by Law No. 20; *provided, further, the Clerk-Marshal of the United States Court for Berlin may, for the purpose of levying execution on a judgment of the United States Court of the Allied High Commissioner for Germany, issue a certified copy of such judgment with the following clause added thereto,* .

> "*The foregoing certified copy is issued to the (designation of party) for the purpose of levying execution.*" [7]

2. All records, process, other documents and rules required for the administration of justice shall, until a United States Judge for Berlin directs otherwise, and except to the extent he so directs, be mutatis mutandis, in such form as have heretofore been required for or in use in the United States Court of the Allied High Commission for Germany.

## ARTICLE 8

### Effective Date and Area of Applicability

This Law is applicable in the United States Sector of Berlin and shall become effective on the date of its signature.

Done at Bad Godesberg, on April 28, 1955.

## JAMES B. CONANT

United States High Commissioner for Germany

2. All records, process, other documents and rules required for the administration of justice shall, until a United States Judge for Berlin directs otherwise, and except to the extent he so directs, be mutatis mutandis, in such form as have heretofore been required for or in use in the United States Court of the Allied High Commission for Germany.

7. Amendment added by Ordinance No. 2, Amending United States High Commissioner Law No. 46, United States Court for Berlin, done at Berlin, 9 February 1957, Allied Kommandatura Berlin Gazette, Supp. 83, Page 1132.